GEORGIA RAILWAY & ELECTRIC CO. *v.* NORRIS, admx.

Whether the acts of negligence alleged were the proximate cause of the injuries sustained was a question for the jury. The evidence was sufficient to uphold the verdict, and no error appears requiring a new trial.

FEBRUARY 24, 1911.

Action for damages. Before Judge Ellis. Fulton superior court. January 22, 1910.

George C. Norris brought suit for damages against the Georgia Railway and Electric Company, making substantially the following allegations: On February 3, 1907, about 6.30 p. m., he boarded one of the defendant's cars, and when he paid his fare he requested

the conductor to let him off at Bellwood avenue, and the conductor promised to do so, and to let him know when they reached that point, which was a regular stopping-place on the line to let passengers on and off the car. The conductor failed to so notify him, and failed to let him off at that place. He was carried some distance beyond it before he discovered that the car had passed it. When he made this discovery he reminded the conductor of his promise to let him off at Bellwood avenue, and the conductor told him "just to stay on the car until they met the inbound car, and that he would send petitioner back on the inbound car to Bellwood avenue." When the inbound car was met it was on a switch or side-track. The plaintiff, intending to board it to be carried back according to the promise of the conductor, left the car in which he was riding. As he stepped to the ground both cars moved off suddenly, and the plaintiff, "being unable to catch either car, was left standing at said place." It was dark, cold, and raining. The plaintiff, not knowing where he was, and seeing no house to which he could go for comfort, started to walk back up the track towards Atlanta to find a house to which he could go for comfort or to return to town. The place where he was left was near the old power-plant, but at the time he did not know where he was or how far from town. "After petitioner had walked for some distance up the track, not having come to any house, his foot slipped in between two cross-ties on a trestle or culvert and petitioner fell to the track." He was using due care, and his fall was due to the extreme darkness, and to the wet and slippery condition of the track and cross-ties. Before he could get his foot out of the trestle and arise, another of defendant's cars ran against him, and he was caught by the running gear and machinery thereof and dragged under the car for some distance, thereby seriously injuring him. The acts of negligence are alleged as follows: "Petitioner shows that defendant was negligent in carrying him by his destination as aforesaid, and was negligent in not allowing petitioner to catch said inbound car, and was negligent in leaving petitioner at said place as aforesaid. Petitioner was in law a passenger, and defendant owed to him extraordinary care to carry him safely to his destination and discharge him at his destination in safety, but that defendant failed to exercise even ordinary care towards petitioner." The company in its answer admitted that it was a street-railroad corporation, having

an office and agent in the county, and that Bellwood avenue was a "regular stopping-place" on its line to let passengers on and off of defendant's cars, but either denied the other allegations of the petition or stated that for lack of sufficient information it could neither admit nor deny them.

The depositions of Norris were substantially as follows: He boarded one of defendant's cars at the corner of Marietta and Broad streets at 7.30 o'clock on the Sunday evening when he was injured. He paid the conductor his fare, and told the conductor to put him off at "Westview avenue." After having been on the car some time, he asked the conductor "if he had not passed my place, and he looked and said he had," and further said, "You just stay on the car, and I will meet a car right down here, and we will exchange and you come back to your place." We went to the old plant, further than I expected, or he did either, I suppose. He had just forgotten his business on account of the crowd he had. . . He told me to get off quick, and I was off as quick as I could, and I started for the other car and the other car put out as fast as it could go and left me there; and he pulled out too. Both of them pulled out and left me there. There were not any lights about there. That plant had not been in use for sometime, I suppose, and I had no idea it was the power-house. I had no idea where I was. I started supposing I was not such a long distance from Westview crossing. I stayed there at the old power-plant two or three minutes, something like that. I broke off up the track as hard as I could go. . . I was going towards town; I didn't know I was any ways near the plant. If I had, I never would have went towards town, I would have waited. That line was the river line. I had started that afternoon to my Uncle's. He lives at Bellwood avenue. I stated that I told the conductor to put me off at a certain place. That place I told him to put me off at was Bellview avenue. He did not put me off there. I just went as fast as I could, running part of the time and part of the time walking. I could not see a thing on the ground, one side or the other. All I could see was the track on each side, and I followed it. That is all; all I know of. I knew if I could keep that, I would come to town directly; and I was very much surprised not to see the electric lights in a few minutes, but them I didn't see for sometime. I never did in fact. I did not walk on till I got to town. The car

caught me. When the car caught me I had run onto the bridge. I could not get away. I was on my knees when the car hit me. I fell down two or three times trying to get up. What made me fall down was the slippery ties. They were covered with mud. When I went on a bridge, I mean it was a common bridge along the side of the road. I couldn't get up, on account of my legs being down in the cross-ties; I was hanging down in there, and the car caught me. It just run over my back. I never had time to get away. As to what did it do to me, as to whether it just passed over me and left me there, I answer, yes. When I first seen it was going to hit me in spite of everything I possibly could do, I bowed down, and I guess that is just what saved my life. I was scared to death; I just gave up. I seen it was going right over me. I do not know what happened after the car struck me." When Norris boarded the car in town he expected to go to his uncle's. He had been there "about twice at night and twice in the daytime; possibly it would make five times." The car that struck him was going from town.

Norris died before the case was tried in the lower court, and the administratrix on his estate was made party plaintiff. There was testimony with respect to the character of the injuries received, and that he died because of them.

The defendant company introduced a physician who testified, that Norris died from consumption; that he examined Norris at Grady hospital at 8.10 p. m. on the night that he was injured, and that he was then intoxicated. The signs he saw of his being drunk were "the odor of whisky and his mental condition. . . That lick on the head could cause a similar mental condition to drunkenness." He didn't know whether or not any whisky had been given Norris before he saw him. The motorman in charge of the car that injured Norris testified, that Norris "appeared to be a drunk man; I smelled whisky on him; I say he was drunk in my opinion;" that the car struck Norris about 6.40 p. m.; that he saw Norris when in about 20 or 30 feet of him, and "I reversed the car and brought it to a stop as soon as possible." There was testimony in behalf of the defendant that there was no such place on the street-railway line as "Westview avenue, Westview crossing, or Bellview avenue." One witness for the defendant testified substantially as follows: It is about two and one third miles from the power-plant to the trestle where deceased was injured; for some distance be-

yond the trestle from Atlanta the street-railroad track is in a macadamized public road; were you to go from the power-plant to the trestle you would first travel about one half mile on the private right of way: the street railroad from the power-plant to the trestle crossed several public roads; on the side of the road there are some dwellings; the road passed through Simsville, which is about one and three fourth miles from the trestle, and "for that whole distance the railroad track was on one side or in the centre of the public highway." Simsville is a little town where there are twelve or fifteen houses, most of which are near the track. Alongside the highway there are about twenty-five residences and one store, "the larger part of these improvements were there in 1907." The trestle is over a creek. The track is in the centre of the public road leading to the trestle. On the side of the trestle there is a wooden bridge; "the railroad track swings to the side and crosses outside of the wooden bride." This trestle is beyond the city limits. There is a place called "Johnson's switch" where cars passed one another; there are about a dozen buildings between thirty and fifty feet from the track between this switch and the trestle. This switch is about three thousand feet from the trestle. "In February of 1907 cars ran every thirty minutes. At the rush hour at night, six o'clock, every thirty minutes. After eight o'clock every thirty minutes; that was their regular schedule for all day, up to, I think, eleven o'clock. Before seven o'clock they ran fifteen minutes to the old plant, a fifteen-minutes schedule. That was the rush hour, from five to seven thirty or eight, or something like that. To run from this trestle down to the old power-plant takes about fifteen minutes, I should say, ten or fifteen. From the time a car going out past this place, before another car going out passed this place, it would be about thirty minutes; except in the rush hours, those cars would pass about every thirty minutes. After one car going out passed this point, before another car going out, following it, on the thirty-minutes schedule, passed this point, there wouldn't be more than fifteen or twenty minutes elapse. Down to Johnson's switch it takes a car to run from the trestle only a few minutes; from the trestle, five or six minutes. It would be about twenty-five minutes, between twenty and twenty-five minutes, before another car going out would pass this trestle. When the cars were running on the thirty-minutes schedule, they did not pass

at Johnson's switch. When they passed at Johnson's switch at all, they were running a fifteen-minutes schedule. And they ran every fifteen minutes up to seven o'clock. It is deemed unnecessary to set forth any testimony except that above referred to. The jury rendered a verdict for the plaintiff, and to the order of the court refusing a new trial the defendant excepted.

*Colquitt & Conyers,* for plaintiff in error.

*C. D. Hill* and *Moore & Branch,* contra.

HOLDEN, J. (After stating the foregoing facts.) Norris brought suit against the defendant for damages on account of personal injuries received. He was carried, during a dark, rainy night, some distance beyond his destination, by an outgoing car which he boarded in the city of Atlanta, to a point at which the car on which he was riding met an incoming car. This was in the early part of the night. The conductor did not let him off in time to catch the latter car, and he attempted to walk back. After walking a considerable distance along the track, he walked on a trestle on which the defendant's tracks were laid, and slipped and fell between the cross-ties, and before he could extricate himself was struck and run over by another outgoing car. A dirt road ran alongside the tracks of the defendant at this point, which crossed a stream by means of a bridge lying alongside this trestle. Practically the entire allegations of the petition and the material evidence delivered upon the trial on the question of the right to recover appear in the statement of facts. The plaintiff died pending the suit, which then proceeded in the name of his administratrix.

The defendant in error contends that the jury had a right to believe that Norris, the person who was injured, was left at a place known as Johnson's switch, a little more than one half a mile from the trestle at which he was injured. Under all the evidence in the case, and especially in view of the allegation in the petition "that the place where he was left as aforesaid was near the old power-plant on the defendant's said line," we do not think it proper that the case be considered on the theory that the place at which Norris left the car was Johnson's switch. The old power-plant at which he was left was about two and one third miles from the trestle where he was injured. The evidence shows that the power-plant was a place at which the cars of the defendant passed each other, and at the time the plaintiff was left there the cars passed that

point every fifteen minutes, or every thirty minutes. This fact was, of course, known to the conductor who had the plaintiff to get off at that point, but it nowhere clearly appears that Norris himself knew this fact. The only acts of negligence alleged were that the company "was negligent in carrying him by his destination as aforesaid, and was negligent in not allowing petitioner to catch said inbound car, and was negligent in leaving petitioner at said place as aforesaid." Counsel for the company contend, that, conceding that the company was guilty of the acts of negligence alleged, it should be adjudged as a matter of law that under the proved facts this negligence was not the proximate cause of the injury sustained by Norris. It is not reasonable to suppose, they contend, that the conductor, when he had Norris to leave his car for the purpose of boarding the other car on the side-track at the power-plant, would anticipate that Norris, if he failed to board this car, would travel up the track during a dark, rainy night, when he was unable to see anything except the iron rails on the track, and, with a bridge crossing the stream by the side of the trestle, would undertake to pass over the latter, slip thereon, and before he could extricate himself be run over by another car. Under the facts of this case, the injuries received by Norris can not be said, as a matter of law, not to be the legal and natural result of the negligence of the defendant company in carrying him beyond the point of his destination and in not allowing him to catch the ingoing car and leaving him at the old power-plant. The court did not err in leaving it to the jury to decide whether the damages sustained by Norris were too remote to be the basis of any recovery because of the acts of negligence charged. Norris testified, among other things, as follows: The place where he was told by the conductor to get off was where there was a side-track and "an old power-plant," which was not then in use. He did not know that he was at the "old power-plant," and "I had no idea where I was." It was dark and raining. After remaining there two or three minutes, he started up the track, supposing he was not such a long distance from Westview crossing. "All I could see was the track on each side and I followed it. . . I knew if I could keep that I would come to town directly, and I was very much surprised not to see the electric lights in a few minutes." Being left by the cars at night at a place where he did not know where he was, when it was

raining and so dark that the only thing he could see "was the track on each side," it can not be said as a matter of law that Norris, acting as an ordinarily prudent man, would not leave the place at which he was left and walk back up the track and on the trestle. The evidence does not show that Norris knew he was entering on a trestle when he slipped and fell between the ties. The conductor knew that other cars of the company would be running on the track coming out of Atlanta. Whether the negligence of the company, if it was guilty of the negligence alleged, was the proximate cause of the injuries received, was a question for the jury. *Georgia Railway & Electric Co.* v. *McAllister*, 126 *Ga.* 447 (55 S. E. 167, 7 L. R. A. (N. S.) 1177, and authorities cited in note) ; Indianapolis & E. Ry. Co. *v.* Barnes, 35 Ind. 485 (74 N. E. 583, 4 St. Ry. R. 220).

There is no merit in any of the assignments of error relating to the rulings of the court. While two of the charges complained of may have been inapplicable, and another inaccurate, the charges excepted to, in view of the entire charge, involve no error requiring a new trial.

*Judgment affirmed. All the Justices concur, except Beck, J., dissenting.*